**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Christian Liam Schenk,<br><br>Defendant. | Case No. 0:26-cr-00174-SRN-SGE<br><br>**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT** |

## INTRODUCTION

Christian Schenk is a Canadian citizen admitted to the United States as a lawful permanent resident in 2013 and, in 2024, a resident of Eden Prairie, Minnesota. He is charged with two federal crimes arising from a single morning, November 5, 2024, at a polling place in Eden Prairie: that he, "an alien," did "knowingly vote" in that day's general election, 18 U.S.C. § 611 (Count 2), and that he "knowingly made a false statement and claim that he was a citizen of the United States, in order to register to vote and to vote," 18 U.S.C. § 1015(f) (Count 1). (Dkt. 1.) He moves to dismiss both counts.

Count 2 fails for two independent reasons. First, Congress had no power to enact § 611 as applied to a vote cast in an election conducted by the State of Minnesota. The Constitution ties the qualifications of voters in federal elections to the qualifications each State sets for its own legislative electors, U.S. Const. art. I, § 2, cl. 1; *id.* amend. XVII, commits the appointment of presidential electors to the state legislatures, *id.* art. II, § 1, cl. 2, and gives Congress authority over the "Times, Places and Manner" of federal elections but not over who may vote in them. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S.

1, 16–17 (2013) ("*ITCA*"). Section 611 prescribes a voter qualification, as the Southern District of Florida held on October 1, 2026, in dismissing a § 611 charge. *United States v. Cox*, No. 0:25-cr-60249-DSL, ECF No. 64 (S.D. Fla. Oct. 1, 2026), 2026 WL 2948729 (Ex. A). Second, § 611 forbids an alien "to vote," and the only act the government has identified is Mr. Schenk's signature on an electronic polling-place roster, the step that under Minnesota law precedes receiving a ballot; no record in the production shows a ballot issued to or cast by him.

Count 1 fails because it does not identify the "false statement and claim" that is the entire substance of the offense. It pleads the statute's generic words, a single date, and both statutory purposes conjunctively, while the government's records place the registration two months earlier, redact every field that would show where it came from, and state the theory as an inference: registration "would have required him to falsely claim U.S. citizenship." (CLS_00000002.) Under Minnesota's automatic-registration statute a registration need not involve any such claim, and the government has not said what the statement was. (Dkt. 24–26.) The count fails *Russell v. United States*, 369 U.S. 749, 763–66 (1962), and, if it rests on two statements made two months apart for two different statutory purposes, is duplicitous as well.

## BACKGROUND

### A. The Statutes

Section 611 was enacted by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, § 216(a), 110 Stat. 3009-546, 3009-572. It provides:

> It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless— (1) the election is held partly for some other purpose; (2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and (3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

18 U.S.C. § 611(a). A violation is punishable by up to one year in prison. *Id.* § 611(b). The statute does not define "vote."

Section 1015(f) was enacted by the preceding section of the same Act. IIRIRA § 215, 110 Stat. at 3009-572. It punishes "[w]hoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election," by up to five years in prison. 18 U.S.C. § 1015(f). The offense is complete upon the knowing false statement made for the statutory purpose, and a false claim made "in order to register to vote" and one made "in order to vote" are alternative ways of committing it.

**B. Minnesota's Qualifications, Its Registration System, and Its Polling-Place Procedure**

Minnesota sets its own qualifications for voting. Its constitution provides that "[e]very person 18 years of age or more who has been a citizen of the United States for three months and who has resided in the precinct for 30 days next preceding an election shall be entitled to vote in that precinct." Minn. Const. art. VII, § 1. The eligibility statute

requires citizenship, age eighteen, and twenty days' residence, Minn. Stat. § 201.014, subd. 1 (2024), and makes it a felony for "[a]ny individual who votes who knowingly is not eligible to vote," *id.* subd. 3. Minnesota did not always require citizenship. Its 1857 constitution extended the franchise to "[w]hite persons of foreign birth, who shall have declared their intentions to become citizens, conformably to the laws of the United States upon the subject of naturalization," Minn. Const. of 1857, art. VII, § 1, and declarant aliens voted in Minnesota, in federal as well as state elections, until the people of the State amended their constitution in 1896 "[t]o prohibit aliens from voting." 1895 Minn. Laws ch. 3; Minn. Legislative Reference Library, *State Constitutional Amendments Considered* (1896 amendment adopted, 97,980 to 52,454).[1]

Two features of Minnesota's election machinery matter here. The first is automatic voter registration. Since April 29, 2024, Minnesota has registered applicants for a driver's license or identification card automatically, on the basis of the citizenship documentation the Department of Public Safety ("DPS") classifies during the license transaction, without a voter registration application and without the certification of citizenship such an application carries. Minn. Stat. § 201.161, subds. 1, 3 (2024); Office of the Minn. Sec'y of State, *Update on Automatic Voter Registration System* (Sept. 12, 2024) (Ex. E). The statute provides: "The transfer of an individual's record under this section does not constitute an attempt to register to vote or a completion of a voter registration form by that individual." Minn. Stat. § 201.161, subd. 7. On September 12, 2024, the Secretary of State and DPS

[1] Available at: https://www.lrl.mn.gov/mngov/constitutionalamendments.

announced that DPS's review had "flagged a small number of applicant files as needing additional confirmation of voter registration information, including . . . citizenship," because "due to human error their documentation was misclassified or not properly saved to the DVS database," and that the affected registrations had been inactivated. (Ex. E.)

The second is the polling-place roster. "[A]n individual seeking to vote shall sign a polling place roster or voter signature certificate which states that the individual" is at least eighteen, "is a citizen of the United States," meets the residence requirements, is not disqualified, "is registered," and "has not already voted in the election." Minn. Stat. § 204C.10(a) (2024). The signature begins the process: "After the applicant signs the roster or voter signature certificate, the judge shall give the applicant a voter's receipt. The voter shall deliver the voter's receipt to the judge in charge of ballots as proof of the voter's right to vote, and thereupon the judge shall hand to the voter the ballot." *Id.* § 204C.10(d). The voter marks the ballot and must "immediately deposit each ballot in the ballot box." *Id.* § 204C.13, subds. 2, 3, 5. A person who signs the roster may still be challenged and, if found ineligible, "shall not be allowed to vote." *Id.* § 204C.12, subd. 3. And "[f]or purposes of proving a violation of" the State's unlawful-voting section, "the signature of an individual on a polling place roster or voter signature certificate is prima facie evidence of the *intent* of the individual to vote at that election." *Id.* § 204C.14, subd. 2 (emphasis added). Minnesota treats the signer as an "applicant" who intends to vote, and treats voting as what happens afterward, with a ballot.

### C. The Indictment and the Government's Records

The indictment, returned September 24, 2026, charges each offense in a single

sentence, "[o]n or about November 5, 2024." Count 1 alleges that Mr. Schenk, "an alien, knowingly made a false statement and claim that he was a citizen of the United States, in order to register to vote and to vote in a Federal, State and local election." (Dkt. 1 at 1.) Count 2 alleges that he, "an alien, fully knowing that he was not a United States citizen, did knowingly vote in an election held in part for the purpose of electing a candidate for President, Vice President, United States Senator, and Member of the House of Representatives." (*Id.* at 2.) Neither count says what Mr. Schenk said or signed, to whom, or in what document; neither identifies the act said to constitute the vote.

The discovery produced October 13, 2026 (cited by Bates number "CLS_") supplies the government's records.[2] A Voter Registration Public Information Report lists a "Registration Date" of September 12, 2024, nearly two months before the charged date, and a single voting-history entry for November 5, 2024 by method "P." (CLS_00000586.) A Statewide Voter Registration System ("SVRS") voting-history screen records the same entry with the source "Roster." (CLS_00000584.) An SVRS voter-record screen has its status, source, verification, and registration-date fields blacked out. (CLS_00000585.) A one-page electronic poll-book printout, time-stamped 10:14:57 a.m. on November 5, 2024, bears Mr. Schenk's name, the § 204C.10 oath (including "that I am a citizen of the United States"), a signature, and the notation "BALLOT STYLE / Precinct: EDEN PRAIRIE P-20." (CLS_00000583.) The only driver's-license or voter-related application in the production is a DPS REAL ID renewal application dated February 13, 2023, which declines

[2] The cited pages are collected, in Bates order and with the redactions required by Fed. R. Crim. P. 49.1, as Exhibit D to the Declaration of Nico Ratkowski filed with the motions.

voter registration and asks no citizenship question. (CLS_00000014.) The production contains no voter registration application, no registration oath, no record of a ballot issued, and no record of a ballot cast. The Form I-213 prepared on the day of Mr. Schenk's administrative arrest states that a subpoena to the Secretary of State produced "voter information revealing that SCHENK (Voter ID: 6509694) voted in person on November 5, 2024 at the State General Elections at Eden Prairie P-20." (CLS_00000233; *see* CLS_00000545.) The report requesting his arrest states the theory of Count 1 as an inference: "Records show that SCHENK registered to vote in past federal elections, which would have required him to falsely claim U.S. citizenship." (CLS_00000002.)

The government has also had, since August 13, 2026, Mr. Schenk's recorded account: that he "was registered to vote, not by himself," that he learned of the registration from "a form sent to his house," that "I told them I wasn't supposed to be on the roll voting registry thing," that "[t]hey took my info and I left with three kids and my wife," and, three separate times, that he did not vote. (CLS_00000548–49; *see* CLS_00000580–82.) That account has not been tested against the fuller polling-place record: the production contains the signed certificate and the voting-history entry, but no election judge's account and no native check-in, receipt, void, or ballot-issuance record.

On October 23, 2026, Mr. Schenk moved for a bill of particulars identifying each statement on which Count 1 rests and whether it was made to register, to vote, or both, and the act the government contends constituted the vote, "including whether it contends that a ballot was issued to and cast by him." (Dkt. 24 at 6–9.) The government has stated that it opposes the motion, which remains pending. (Dkt. 25.)

## LEGAL STANDARD

A defendant may raise by pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits," Fed. R. Crim. P. 12(b)(1), and must raise before trial a claim that the indictment is duplicitous, lacks specificity, or fails to state an offense, Fed. R. Crim. P. 12(b)(3)(B)(i), (iii), (v). Pretrial resolution is appropriate where "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense," *United States v. Grubb*, 135 F.4th 604, 607 (8th Cir. 2025) (quoting *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010), and *United States v. Covington*, 395 U.S. 57, 60 (1969)), but not where the challenge is "inevitably bound up with evidence about the alleged offense itself," *id.* at 607–08 (quoting *United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016)). An indictment is sufficient if it "contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008).

## ARGUMENT

### I. Congress Lacked Power to Enact Section 611 as Applied to a Vote Cast in a Minnesota Election.

#### A. Section 611 prescribes who may vote in federal elections.

The text answers what kind of law § 611 is. The statute "makes it a crime for a certain class of people (non-citizens) to vote in any election where a federal office is on the ballot. To that extent, the statute dictates 'who may vote.'" *Cox*, slip op. at 21–22 (quoting

*ITCA*, 570 U.S. at 16). It does not regulate the time, place, or manner of an election; it does not require registration, prescribe a ballot, protect polling places, or punish fraud, bribery, intimidation, or impersonation; and it does not make it a crime to vote in violation of a State's eligibility rules. Section 611 is a citizenship requirement for voting in federal elections, enacted and enforced by the national government on its own authority.

That a citizenship requirement is a "qualification" in the constitutional sense is not open to serious dispute. Minnesota's constitution lists it alongside age and residence as a condition of being "entitled to vote." Minn. Const. art. VII, § 1. The Supreme Court has long treated it the same way. *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 177–78 (1875), observed that "citizenship has not in all cases been made a condition precedent to the enjoyment of the right of suffrage," cataloguing the States, Minnesota among them, that then permitted declarant aliens to vote, and reaffirmed that the Constitution "does not confer the right of suffrage upon any one." *See Pope v. Williams*, 193 U.S. 621, 632 (1904); *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 50 (1959). The particular results in *Minor* and *Lassiter* have been overtaken by later amendments and legislation; they are cited for their account of where the power to set qualifications resides, which has not. *ITCA* identified the "Voter Qualifications Clause" and the Seventeenth Amendment as the provisions that govern "who may vote" in congressional elections and described a State's citizenship requirement as precisely the kind of qualification those Clauses reserve to the States. 570 U.S. at 16–17.

In *Cox*, the government's principal position was not that § 611 is something other than a qualification, but that Congress may set this qualification under *Oregon v. Mitchell*,

400 U.S. 112 (1970), the immigration power, or the Elections Clause. *Cox*, slip op. at 6, 20, 22–23. Those arguments are addressed below.

### B. The Constitution assigns the power to set voter qualifications in federal elections to the States, and the Framers rejected the alternative.

Each time the Constitution addresses the qualifications of voters in federal elections, it points to the States. Members of the House are chosen "by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. The Seventeenth Amendment adopts the same criterion for Senators. Presidential electors are appointed by each State "in such Manner as the Legislature thereof may direct," *id.* art. II, § 1, cl. 2; *see ITCA*, 570 U.S. at 16. The Court reads these provisions as establishing that "the Elections Clause empowers Congress to regulate how federal elections are held, but not who may vote in them," that "[o]ne cannot read the Elections Clause as treating implicitly what these other constitutional provisions regulate explicitly," and that "[p]rescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government.'" *Id.* at 16–17 (quoting The Federalist No. 60, at 371 (A. Hamilton)); *see Mitchell*, 400 U.S. at 210 (Harlan, J., concurring in part and dissenting in part).

The allocation was deliberate. At the Convention, Gouverneur Morris moved to replace the Committee of Detail's reliance on state qualifications with a federal freehold requirement; the motion was debated and defeated. 2 The Records of the Federal Convention of 1787, at 201–06 (Max Farrand ed., 1911). Madison explained that "[t]o have

reduced the different qualifications in the different States to one uniform rule, would probably have been as dissatisfactory to some of the States as it would have been difficult to the convention," and that "[t]o have left it open for the occasional regulation of the Congress, would have been improper." The Federalist No. 52, at 326 (J. Madison) (Clinton Rossiter ed., 1961). *ITCA* relied on both passages. 570 U.S. at 17. And if the Elections Clause does not permit a legislature to add qualifications for candidates, which the Constitution fixes, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995), it does not permit Congress to add qualifications for voters, which the Constitution assigns to the States. *See Cook v. Gralike*, 531 U.S. 510, 523 (2001).

### C. The Elections Clause reaches the "Times, Places and Manner" of elections, not the electorate.

The Elections Clause is the only provision that gives Congress a general regulatory role in congressional elections, U.S. Const. art. I, § 4, cl. 1, and the implied power to protect presidential elections "from corruption," *Burroughs v. United States*, 290 U.S. 534, 545, 547 (1934), is a power over their "mechanics," *Cox*, slip op. at 28 n.24, not over the electorate. Within its field the Clause is sweeping: Congress may "provide a complete code for congressional elections," including rules on "registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, [and] counting of votes." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see Ex parte Siebold*, 100 U.S. 371, 391–92 (1880); *Ex parte Yarbrough*, 110 U.S. 651, 661–62 (1884). Each example concerns the conduct of the election. None concerns the identity of the electorate.

*ITCA* confirms the limit. The Court read the National Voter Registration Act to

leave Arizona a route to enforce its citizenship requirement because a contrary reading "would raise serious constitutional doubts": "Since the power to establish voting requirements is of little value without the power to enforce those requirements, Arizona is correct that it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." 570 U.S. at 17. Section 611 goes further than the statute whose mere interpretation gave the Court pause: it does not burden a State's enforcement of its own qualification; it substitutes a federal qualification for the State's. Lower courts apply *ITCA*'s allocation as the governing rule, *see Fish v. Kobach*, 840 F.3d 710, 748–49 (10th Cir. 2016) ("the states—not Congress—have the power to determine 'who may vote in' elections" (quoting *ITCA*)), and *Cox* applied it to § 611, observing that the government's Elections Clause argument "stretches the Elections Clause well past its clear textual limits," slip op. at 28–29.

The government's answer elsewhere has been that § 611 is not a qualification but a "manner" regulation enforcing the citizenship qualification every State already imposes. The most recent judicial statement of that view is a dissent from the Ninth Circuit's jurisdictional dismissal of the government's emergency appeal in its suit over California's mail ballots. *United States v. California*, No. 26-7070 (9th Cir. Oct. 26, 2026) (per curiam order), slip op. at 29–31 (Bumatay, J., dissenting). The dissent reasoned that "§ 611(a) doesn't itself impose voter qualifications," because "California law independently disqualifies noncitizens from voting," so that the statute's "deterrent effect is to prevent noncitizen votes from being cast at all, which is consistent with the preexisting qualifications already set by the states," and falls "well within Congress's 'Manner'

power." *Id.* at 30–31. The dissent noted that "no party challenges § 611(a)'s constitutionality," *id.* at 31 n.3. The argument fails for a reason its own premise exposes. A federal rule does not become a regulation of the "manner" of elections because the States presently agree with it; Congress's power must exist whether or not they do, and § 611 by its terms does not depend on state law. It forbids an alien to vote in an election for federal office even where the State has chosen to permit it, excepting only elections in which alien voting on other matters "is conducted independently of voting for a candidate" for federal office. 18 U.S.C. § 611(a)(1)–(3). A statute that would override a State's decision to enfranchise is a statute about who may vote. Congress could have enacted a statute that punishes voting in a federal election in violation of the State's own qualifications, *see Smiley*, 285 U.S. at 366–67 (Congress may impose "additional penalties for the violation of the state laws"); *Cox*, slip op. at 24–25; it did not, and the statute it enacted applies whether or not state law is violated. Nor is § 611 a rule about how a qualification is "proven," the registration-stage regulation the dissent's authority described, *see* slip op. at 30–31 (quoting Lori A. Ringhand, *The Regulation of Presidential Elections*, 2025 Wis. L. Rev. 509, 512); Congress has enacted rules of that kind, 52 U.S.C. §§ 10307(c), 20507, 20508, 20511; 18 U.S.C. § 1015(f), and they are not challenged here. Section 611 punishes the act of voting by a class of persons defined by status, without regard to any false statement, fraud, or failure of proof. That is a qualification by any other name.

### D. History confirms that the States, not Congress, have decided whether noncitizens may vote.

Alien suffrage was a recognized feature of American elections from the Founding

era well into the twentieth century. At least twenty-two States and territories at one time permitted noncitizens to vote, and the practice did not end until Arkansas eliminated it in 1926. *See* Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1397–1417 (1993); *Cox*, slip op. at 25–26. In those States declarant aliens voted for Members of Congress and presidential electors for decades, Congress admitted new States whose constitutions enfranchised them, and no federal prohibition existed until 1996. That "regular course of practice" can "liquidate & settle the meaning" of constitutional text. *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (quoting Letter from James Madison to Spencer Roane (Sept. 2, 1819)). It also answers the suggestion that § 611 codifies a universal norm: the norm is universal today only because every State has chosen it, and "no tradition" of state choice "can supersede the Constitution" by converting a reserved state power into a congressional one. *Cox*, slip op. at 26 (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 96 n.1 (1990) (Scalia, J., dissenting)).

**E. No other enumerated power supports Section 611.**

"Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000). The government has offered three candidates: the immigration and naturalization powers, the enforcement clauses of the Reconstruction Amendments, and *Oregon v. Mitchell*. None supplies what the Elections Clause withholds.

### 1. *The immigration and naturalization powers are general powers that do not displace a specific structural allocation.*

Congress's authority over "the subject of immigration and the status of aliens" is "broad" and "undoubted." *Arizona v. United States*, 567 U.S. 387, 394 (2012). The government has argued that because § 611 regulates "aliens," it is an exercise of that power. *Cox*, slip op. at 23. The argument fails for three reasons.

First, the statute does not regulate immigration or alien status. It does not define who may enter, remain, or naturalize, and it attaches no immigration consequence to voting. Congress has done those things in Title 8, where an alien "who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation" is made removable and inadmissible. 8 U.S.C. §§ 1182(a)(10)(D)(i), 1227(a)(6)(A). Those provisions take the voting rule from whatever sovereign set it and regulate the alien's status in light of the violation. Section 611 supplies the voting rule itself, in Title 18, enforceable by imprisonment, regardless of what any State has decided. The "unless" clause makes the point unmistakable: Congress carved out state-authorized alien voting for non-federal offices, which would have been pointless if the statute's object were the status or conduct of aliens as such. *See Cox*, slip op. at 24.

Second, a general power cannot accomplish what a specific provision forbids. "[E]ven when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72 (1996). "Article I gives Congress a series of enumerated powers, not a series of

blank checks," and the Indian affairs power, though "plenary within its sphere," has "borders." *Haaland v. Brackeen*, 599 U.S. 255, 276 (2023). Those cases concern federal commands to state governments, and *Haaland* upheld the statute before it, 599 U.S. at 277; they are cited for the principle they share: a general grant of power is bounded by the Constitution's specific allocations. Here the allocation is textual. The Voter Qualification Clauses "address the issue of voter qualifications with specific language, while the immigration and foreign affairs clauses are drafted more broadly," and "[f]oundational constitutional limits do not give way, even to capacious general provisions of enumerated congressional power." *Cox*, slip op. at 26–27; *cf. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Third, the Framers rejected a federal power over voter qualifications in 1787; the government cannot recover it by relabeling a voting rule as an immigration rule. Nor does *United States v. Singh*, 979 F.3d 697, 710–11 (9th Cir. 2020), which sustained the ban on campaign contributions by foreign nationals under the immigration and foreign-affairs powers, supply the missing power. Campaign spending is not voting; no constitutional clause assigns the regulation of foreign nationals' contributions to the States; and the statute there does not reach lawful permanent residents such as Mr. Schenk at all, *id.* at 710 n.3. *Singh* shows that Congress may regulate foreign nationals' participation in elections where no specific constitutional allocation stands in the way. Here one does.

***2. The Necessary and Proper Clause cannot supply a power the Constitution withholds.***

The Necessary and Proper Clause authorizes laws "rationally related to the

implementation of a constitutionally enumerated power," *United States v. Comstock*, 560 U.S. 126, 134 (2010), but a law "must also not be prohibited by the Constitution," *id.* at 135 (cleaned up) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819)), and must "consist with the letter and spirit of the constitution," *McCulloch*, 17 U.S. at 421. A law that invades "the States' retained sovereignty" is not "proper." *Printz v. United States*, 521 U.S. 898, 923–24, 928 (1997); *see NFIB v. Sebelius*, 567 U.S. 519, 559–60 (2012) (opinion of Roberts, C.J.). The Voter Qualification Clauses are an express reservation to the States; a statute that overrides them is not a proper means of executing any other power.

#### ***3. The enforcement clauses of the Reconstruction Amendments do not apply.***

The enforcement power of § 5 of the Fourteenth Amendment and § 2 of the Fifteenth is remedial: there must be "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," and Congress may not "decree the substance of the Fourteenth Amendment's restrictions on the States." *City of Boerne v. Flores*, 521 U.S. 507, 519–20 (1997). There is no constitutional injury here to remedy. No provision forbids a State to enfranchise noncitizens, and § 611 protects no one's right to vote; it removes a class of persons from the electorate. The *Mitchell* plurality's reliance on § 5 rested on a congressional judgment that age-based exclusions of adults denied equal protection, 400 U.S. at 240–41 (opinion of Brennan, White, and Marshall, JJ.); nothing in it supports a power to impose a qualification. *See Cox*, slip op. at 22 n.23.

### 4. *Oregon v. Mitchell does not establish a congressional power to set voter qualifications.*

The government's principal authority in every § 611 case has been *Mitchell*, which upheld the provision of the Voting Rights Act Amendments of 1970 lowering the voting age to eighteen in federal elections. The judgment commanded five votes; no rationale did. Justice Black, alone, reasoned that the Elections Clause and the Necessary and Proper Clause gave Congress the power to set the voting age in federal elections. 400 U.S. at 119–25 (opinion of Black, J.). Five Justices rejected that reading. *Id.* at 143 (opinion of Douglas, J.); *id.* at 209–12 (Harlan, J., concurring in part and dissenting in part); *id.* at 288 (Stewart, J., joined by Burger, C.J., and Blackmun, J., concurring in part and dissenting in part). Justices Brennan, White, and Marshall concurred in the result under § 5 of the Fourteenth Amendment and said they were "not faced with an assertion of congressional power to regulate any and all aspects of state and federal elections, or even to make general rules for the determination of voter qualifications." *Id.* at 240 (opinion of Brennan, White, and Marshall, JJ.). The only theory that would support § 611, Justice Black's, commanded one vote.

Under *Marks v. United States*, 430 U.S. 188, 193 (1977), when "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." The Eighth Circuit applies *Marks* through the "logical subset" test: where no concurring rationale is a logical subset of another, "the only binding aspect of the decision is its specific result." *Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 785 (8th

Cir. 2021) (citing *King v. Palmer*, 950 F.2d 771, 781–82 (D.C. Cir. 1991) (en banc)). Justice Black's Elections Clause rationale and the Brennan group's Fourteenth Amendment rationale are not logical subsets of one another; they rest on different clauses, reach different results as to state elections, and were each rejected by a majority. The binding content of *Mitchell* is therefore its result: Congress may set a minimum voting age of eighteen in federal elections. *See Cox*, slip op. at 7–13. No five votes support § 611.

The Supreme Court itself has said as much. When Arizona invoked Justice Black's opinion in *ITCA*, the Court responded that the *Mitchell* result, "which lacked a majority rationale, is of minimal precedential value here," because "only Justice Black was of the view that congressional power to prescribe this age qualification derived from the Elections Clause," while "[f]ive Justices took the position that the Elections Clause did not confer upon Congress the power to regulate voter qualifications in federal elections." 570 U.S. at 17 n.8; *see Cox*, slip op. at 12 n.11 (Twenty-Sixth Amendment ratified within months of *Mitchell*).

The government may point to *Kusper v. Pontikes*, 414 U.S. 51, 57 n.11 (1973), which stated in a footnote that "[w]ith respect to elections to federal office . . . the Court has held that Congress has power to establish voter qualifications," citing *Mitchell*. Mr. Schenk calls the footnote to the Court's attention because it describes *Mitchell* the way the government does. It does not control: *Kusper* concerned an Illinois rule on switching party primaries, nothing in it turned on congressional power, and forty years later, in *ITCA*, the Court examined *Mitchell*'s opinions, counted the votes, and found no majority rationale. *See Cox*, slip op. at 12–13 n.12.

**F. *ITCA*'s analysis should guide this Court's decision.**

The government's remaining response has been that *ITCA*'s discussion of voter qualifications is dicta. *ITCA* resolved a preemption question, but it reached its construction of the NVRA because of its reading of the Voter Qualification Clauses and the Elections Clause; the constitutional analysis was the reason the Court rejected Arizona's avoidance argument, and six Justices joined it. *See Cox*, slip op. at 14–15. In this Circuit, "[a]ppellate courts should afford deference and respect to Supreme Court dicta, particularly where it is consistent with longstanding Supreme Court precedent." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 (8th Cir. 2017) (en banc); *see Jones v. St. Paul Cos.*, 495 F.3d 888, 893 (8th Cir. 2007). *ITCA*'s analysis is consistent with *Minor*, *Pope*, *Lassiter*, *Term Limits*, *Gralike*, and the views of the five Justices in *Mitchell* who rejected Justice Black's reading of the Elections Clause.

**F. The challenge is properly decided now, as applied to a Minnesota election.**

The challenge is as-applied. There may be one setting in which § 611 could be sustained: a federal election in the District of Columbia, where Congress's authority under Article I, § 8, cl. 17 may permit it to set voter qualifications and no State's prerogative is at stake. Brief of Court-Appointed Amicus Curiae Paul D. Clement at 38, *Cox*, ECF No. 46 (July 23, 2026); *see Cox*, slip op. at 5 n.4, 29–31 (holding § 611 unconstitutional "as applied"). Mr. Schenk is charged with voting in Minnesota, where the State has set the qualifications for voting, including citizenship, and prescribed the consequences of voting without them, Minn. Stat. § 201.014, subd. 3. The argument is not that Minnesota authorized the vote alleged; it is that Congress has no independent power to impose a

citizenship qualification for voting in a Minnesota election, and to attach a federal criminal sanction to it, even where the State's own qualification is the same. The "no set of circumstances" standard of *United States v. Salerno*, 481 U.S. 739, 745 (1987), therefore does not control.

The question is ripe under Rule 12. It does not depend on how Mr. Schenk came to be at the polling place, what he signed, what he knew, or what the government can prove; it depends on constitutional text, structure, and precedent. *Grubb*, 135 F.4th at 607; *United States v. Louper-Morris*, 672 F.3d 539, 562 (8th Cir. 2012); *see Cox*, slip op. at 4–5. Mr. Schenk recognizes that *Cox* is a district court decision under appeal, *Cox*, ECF No. 65 (Oct. 2, 2026), *appeal docketed*, No. 26-13597 (11th Cir. Oct. 5, 2026); that a facial challenge to § 611 in *United States v. Renaud*, No. 1:26-cr-20128-JB (S.D. Fla.), ECF No. 19 (May 12, 2026), was denied by paperless order "for the reasons stated on the record," without a written opinion, *id.*, ECF No. 67 (Sept. 9, 2026), after which the jury acquitted Mr. Renaud on every count, including the § 611 count, *id.*, ECF Nos. 73, 79 (Sept. 15 & 17, 2026); and that the Eighth Circuit has not addressed the question. The issue must be raised before trial, Fed. R. Crim. P. 12(b)(3)(B), and Mr. Schenk raises it for decision and to preserve it.

## II. Count 2 Fails to State an Offense Because Signing a Polling-Place Roster Is Not "Voting."

Even if Congress could forbid aliens to vote in Minnesota's elections, § 611 forbids one thing: "to vote." The government's records identify one act by Mr. Schenk on November 5, 2024: a signature on an electronic poll-book certificate at 10:14:57 a.m. (CLS_00000583.) The SVRS "voting history" entry on which the government relies bears

the source notation "Roster" (CLS_00000584); how, and from what, the entry was generated the production does not show. No record in the production shows that a ballot was issued to Mr. Schenk, that he marked one, or that he deposited one, and the government has not said whether it contends that any of those things happened. (Dkt. 24 at 7; Dkt. 25.)

**A. "Vote" means to cast a ballot.**

"When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The ordinary meaning of "to vote," in an election, is to cast a ballot: to express a choice among candidates or questions by the means the election provides. *See Vote*, Black's Law Dictionary (12th ed. 2024) (defining "vote" as "[t]he expression of one's preference or opinion in a meeting or election by ballot, show of hands, or other type of communication," and "illegal vote" as "[a] vote that does not count because it was cast by someone not entitled to vote"). No one who checked in at a polling place, was handed nothing, and went home would say, or be understood to say, that he had "voted." Section 611 itself speaks of the "opportunity to vote for a candidate," § 611(a)(3), and one votes "for" a candidate on a ballot, not on a sign-in sheet.

The statutory scheme confirms it again. Congress enacted § 611 and § 1015(f) in consecutive sections of the same Act. IIRIRA §§ 215, 216, 110 Stat. at 3009-572. In § 1015(f) it reached conduct "in order to register to vote or to vote," treating registration and voting as distinct acts; in § 611 it reached only voting. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up). The Seventh Circuit, construing § 611 in the removal context, drew exactly this line: "even if registration to vote were the same as voting—it isn't, and § 611(a) deals only with voting." *Kimani v. Holder*, 695 F.3d 666, 671 (7th Cir. 2012) (Easterbrook, C.J.). The Civil Rights Act of 1960 provides that "the word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast," 52 U.S.C. § 10101(e), and the Voting Rights Act of 1965 carries a definition of the same kind, *id.* § 10310(c)(1). Each is confined to the Act it serves, *id.* § 10101(a)(3)(A), (e); Pub. L. No. 89-110, § 14(c)(1), 79 Stat. 437, 445 (1965); neither defines a word in Title 18; and Congress included no definition in § 611. Even under the Civil Rights Act, the Minnesota Supreme Court recently rejected "appellants' expansive and untenable definition of 'vote'" and held that the "deliberate use" of different words in a neighboring phrase "limits the reach of the broad definition of 'vote' in the Civil Rights Act," treating registration-stage acts as "a threshold step to voting." *Minn. All. for Retired Ams. Educ. Fund v. Simon*, 38 N.W.3d 641, 654–55 (Minn. 2026) (construing "other act requisite to voting" in the Act's materiality provision, 52 U.S.C. § 10101(a)(2)(B)) (citing *Russello*, 464 U.S. at 23). That court did not construe § 611; the comparison is Mr. Schenk's. But the expansive definition exists precisely because the ordinary meaning of "vote" does not include the "action . . . prerequisite to voting"; Congress had to say so where it wanted that result, and it did not say so in § 611.

Mr. Schenk acknowledges *United States v. Boards*, 10 F.3d 587, 589 (8th Cir. 1993), which held that an absentee-ballot application is a "vote" for purposes of what is now 52 U.S.C. § 10307(c) because the Voting Rights Act's "broad definition" of the term reaches any "prerequisite to voting" (quoting 42 U.S.C. § 1973l(c)(1) (1988)); *see United States v. Taylor*, No. 24-1741, slip op. at 7 (8th Cir. Nov. 17, 2025) (applying *Boards* to forged registration and absentee-ballot documents under § 10307(c)). *Boards* confirms the point: the court reached the application stage only because Congress supplied a definition that reaches it. Section 611 contains none, and neither *Boards* nor *Taylor* construed § 611 or involved a person who signed a roster and received no ballot.

Minnesota law, which governs the mechanics of the election at issue, draws the same distinction in terms, as shown above: the person who signs the roster is an "applicant" who is "seeking to vote"; the signature yields a receipt, the receipt yields a ballot, and the ballot is marked and deposited, Minn. Stat. §§ 204C.10(a), (d), 204C.13, subds. 2, 3, 5 (2024); a signer may still be challenged and, if found ineligible, "shall not be allowed to vote," *id.* § 204C.12, subd. 3; and, for purposes of proving a violation of the State's unlawful-voting section, the signature "is prima facie evidence of the intent of the individual to vote," *id.* § 204C.14, subd. 2. Minnesota treats the signature as evidence of intent to vote, not as the vote. The electronic roster at Eden Prairie P-20 changed the medium of the signature, not the law.

Mr. Schenk acknowledges that Minnesota's election-administration law uses the signed certificate as an administrative proxy for a ballot: election judges reconcile the number of ballots counted against "the number of signed voter's certificates" or receipts,

Minn. Stat. §§ 204C.20, subd. 1, 201.225, subd. 5(a) (2024); *see In re Petition Regarding 2010 Gubernatorial Election*, 793 N.W.2d 256, 262–63 (Minn. 2010) (per curiam) (the voter "is given a receipt, which serves as proof of the right to vote and is exchanged for a ballot"). That is a rule for counting expected ballots. The signature may be circumstantial evidence from which a factfinder could infer that a ballot was issued; it is not a definition of the federal offense. What § 611 means is a question of law; what the government can prove is a question for trial under the correct definition.

Lenity resolves any grievous ambiguity that remains. The rule applies where, after "text, structure, history, and purpose" have been consulted, "there remains a grievous ambiguity or uncertainty in the statute." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (cleaned up). Text, structure, and history here point one way; if, after those tools are exhausted, a grievous ambiguity remains as to whether "vote" includes signing in without receiving a ballot, "the tie must go to the defendant." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion); *see United States v. Bass*, 404 U.S. 336, 347–48 (1971) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity" (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971))).

**B. The question is one the Court can and should decide now.**

Mr. Schenk is mindful of *Grubb*. He does not ask the Court to weigh evidence or to decide whether he cast a ballot; that is for the jury if the government contends that he did. He asks the Court to decide what "vote" means, a pure question of statutory construction that no trial would assist, *Grubb*, 135 F.4th at 607, and to apply that construction to the only act the government's records identify: a roster signature and a "voting history" entry

bearing the notation "Roster," and nothing else. (Dkt. 1 at 2; Dkt. 25; CLS_00000583–84.) If the government's theory is that the roster signature is the vote, Count 2 charges conduct that is not an offense under § 611 and must be dismissed. Fed. R. Crim. P. 12(b)(3)(B)(v). If its theory is that Mr. Schenk received and cast a ballot, it should say so, and the Court should hold that the government must prove that act; whether the evidence it offers, the signature included, proves it is a question for the jury and for Rule 29 under the correct definition. Either way the definition should be settled now rather than after a jury has been asked to convict on an undefined word.

## III. Count 1 Must Be Dismissed.

### A. Count 1 does not identify the statement that is the entire substance of the offense.

The offense defined by § 1015(f) is a knowingly false "statement or claim" of citizenship made "in order to register to vote or to vote." The statement is not an incidental detail of the crime; it is the crime, and knowledge, falsity, and purpose are characteristics of it. Count 1 nonetheless pleads the statement in the statute's generic words. It does not say what the statement was, whether written or spoken, to whom it was made, or in what document it appears. It gives one date, "on or about November 5, 2024," and alleges both statutory purposes conjunctively, "in order to register to vote and to vote," although the government's own records place the registration on September 12, 2024. (CLS_00000586.)

That is the pleading *Russell* condemns. An indictment may track the statute, but "where the definition of an offence . . . includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it

must state the species,—it must descend to particulars." 369 U.S. at 765 (quoting *United States v. Cruikshank*, 92 U.S. 542, 558 (1876)); *accord Hamling v. United States*, 418 U.S. 87, 117–18 (1974). Where "guilt depends so crucially upon such a specific identification of fact," the Court's "cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *Russell*, 369 U.S. at 764. In *Russell* the omitted fact, the subject of the congressional inquiry, was "the very core of criminality." *Id.* Here the generic term is "false statement or claim," and the core of criminality is the statement. An indictment that does not identify it "requires the defendant to go to trial with the chief issue undefined" and leaves "the prosecution free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal." *Id.* at 766, 768.

The danger is concrete. The government's records disclose three candidates for the "statement," and the count does not say which it means. The first is the September 12, 2024 registration. But that registration is dated two months before the charged date; every field that would show where it came from is redacted (CLS_00000585); the only driver's-license application in the production declined registration and asked no citizenship question (CLS_00000014); and the government's own report describes the "statement" not as something Mr. Schenk said but as something the agent inferred he must have said: registration "would have required him to falsely claim U.S. citizenship." (CLS_00000002.) Under Minnesota law the inference does not follow. Since April 29, 2024, a license applicant is registered automatically on the basis of DPS's classification of his documents, without any registration application or citizenship certification, and such a registration

"does not constitute an attempt to register to vote or a completion of a voter registration form by that individual." Minn. Stat. § 201.161, subds. 1, 3, 7 (2024). On the date that appears on Mr. Schenk's record, the State announced that "due to human error" some applicants' citizenship documentation had been "misclassified." (Ex. E.) Whether his registration arose that way the production does not show; the fields that would show it are redacted. The second candidate is the poll-book certificate of November 5, 2024, which bears a printed oath including "that I am a citizen of the United States" and a signature. (CLS_00000583.) It fits the date and, if knowingly false, could be a statement made "in order to vote"; it could not be one made "in order to register to vote," because Mr. Schenk was already registered, and the certificate says so. A single statement made for either purpose would suffice, since the two purposes are alternative means of one offense that may be pleaded conjunctively and proved singly, *United States v. Street*, 66 F.3d 969, 974 (8th Cir. 1995), but the count does not say that this is the statement, and the government's own report points to the registration instead. The third is whatever Mr. Schenk said to the election judges, which on the only account in the record was that he was wrongly registered. (CLS_00000548–49, 580–82.) The count as drafted is consistent with any of these theories, with a combination of them, and with a theory the grand jury never considered. That is the "subsequent guess as to what was in the minds of the grand jury" that *Russell* forbids. 369 U.S. at 770; *see Stirone v. United States*, 361 U.S. 212, 217–18 (1960).

The government cannot cure the defect by pointing to discovery or promising particulars later. "[I]t is a settled rule that a bill of particulars cannot save an invalid

indictment," *Russell*, 369 U.S. at 770, and the government has stated its opposition to providing one. (Dkt. 25.) A "false statement or claim" of citizenship can be made on a DPS form, a registration application, a polling-place roster, or to an election judge, under procedures that generate different records and involve different officials, Minn. Stat. §§ 201.071, subd. 1, 201.161, 204C.10(a), and the count does not say which. Count 1 should be dismissed for lack of specificity and failure to state an offense, Fed. R. Crim. P. 12(b)(3)(B)(iii), (v), without prejudice to the government's return to the grand jury with an indictment that identifies the statement it means to prove.

Mr. Schenk acknowledges the authorities on which the government will rely. *United States v. Resendiz-Ponce*, 549 U.S. 102, 107–10 (2007), held that an indictment for attempted illegal reentry need not allege a specific overt act, because "attempt" itself conveys the elements of intent and a substantial step; the Court distinguished *Russell* as a case in which the omitted fact was "central to every prosecution under the statute," so that guilt "depen[ded] so crucially upon such a specific identification of fact." *Id.* at 109–10 (quoting *Russell*, 369 U.S. at 764). *United States v. Hance*, 501 F.3d 900, 906 (8th Cir. 2007), rejected a mail-fraud defendant's argument that the indictment had to list every false statement made to his victims, noting that such details could be sought in a bill of particulars, which he had not requested. Neither helps the government. "False statement and claim" is not, like "attempt," a term that conveys its own content; which statement is meant is the fact on which guilt here "depen[ds] so crucially." Count 1 does not charge a scheme with supporting statements omitted, as in *Hance*; it charges a single statement and omits it, and particulars have been requested and opposed. (Dkt. 24–26.) *Cf. United States*

*v. Vesaas*, 586 F.2d 101, 102–04 (8th Cir. 1978) (directing dismissal of an "incoherent" § 1001 indictment that charged as the false statement the denial of a legal impossibility, where the jury had been allowed to convict on statements "not charged in the indictment").

**B. In the alternative, Count 1 is duplicitous.**

"Duplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Nattier*, 127 F.3d 655, 657 (8th Cir. 1997) (quoting *Street*, 66 F.3d at 974). "The principal vice of a duplicitous indictment is that the jury may convict a defendant without unanimous agreement on the defendant's guilt with respect to a particular offense." *United States v. Karam*, 37 F.3d 1280, 1286 (8th Cir. 1994). The objection must be raised before trial. Fed. R. Crim. P. 12(b)(3)(B)(i). Count 1 charges a false statement "in order to register to vote and to vote." Conjunctive pleading of the two statutory purposes is not itself duplicity; one statement made for either purpose is one offense, and alternative means may be charged together. *Street*, 66 F.3d at 974. If, as the government's records suggest, its theory is that one statement was made in connection with the September 12, 2024 registration and another at the polling place on November 5, 2024, Count 1 joins two offenses: two statements, made two months apart, to different offices, for the two purposes that § 1015(f) states in the alternative. A jury could convict with six jurors persuaded only of a September statement and six persuaded only of a November statement, without twelve agreeing on either. *See United States v. Pietrantonio*, 637 F.3d 865, 869–72 (8th Cir. 2011) (indictment "not actually duplicitous on its face" was "rendered duplicitous by the evidence presented at trial," leaving the court unable to tell whether the jury had been unanimous). Mr. Schenk therefore asks that, if Count 1 is not

dismissed, the government be required to elect the statement on which it will proceed, and that the jury in any event be instructed that it must unanimously agree on a particular statement. *See Karam*, 37 F.3d at 1286.

### IV. Mr. Schenk Requests Leave to Supplement.

The government has not produced the subpoena issued on or about March 31, 2026, the subpoena to which Hennepin County responded on September 10, 2026, the complete returns, the remainder of the certified DPS record, the unredacted SVRS record, or any grand jury material, all requested on October 23, 2026, and the motion for a bill of particulars remains pending. Should that material, or the government's response, disclose a theory of either count different from the ones addressed here, Mr. Schenk requests leave under Rule 12(c)(3) to supplement or amend this motion within fourteen days after the material is produced or the theory disclosed. Good cause exists: any such ground would rest on material that has been requested and not produced, and could not be raised before it is.

## CONCLUSION

The Constitution assigns the power to decide who may vote in federal elections to the States. Minnesota has exercised that power, and Minnesota law supplies the rule and the remedy for a vote cast by a person not entitled to cast it. Congress has no enumerated power to add a federal qualification on top of Minnesota's, and § 611 does nothing else. Count 2 should be dismissed on that ground. Independently, the Court should hold that "vote" in § 611 means the casting of a ballot and, if the government's theory is that the roster signature is the vote, dismiss Count 2 on that ground as well; otherwise the

government must prove at trial that a ballot was received and cast. Count 1 should be dismissed because it charges a false statement without identifying it, or, in the alternative, the government should be required to elect the statement on which it will proceed.

Dated: October 30, 2026

Respectfully submitted,

RATKOWSKI LAW PLLC

/s/ Nico Ratkowski
Nico Ratkowski (Atty. No. 0400413)
332 Minnesota Street, Suite W1610
Saint Paul, MN 55101
P: (651) 755-5150
E: nico@ratkowskilaw.com

Attorney for Defendant

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this memorandum complies with the word limit of LR 7.1(f)(1)(A) and the type-size limit of LR 7.1(h); that it was prepared using Microsoft Word for Microsoft 365, whose word-count function was applied specifically to include all text, including headings, footnotes, and quotations, in the count below; and that the memorandum contains 9,180 words.

Dated: October 30, 2026

/s/ Nico Ratkowski
Nico Ratkowski (Atty. No. 0400413)