**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Christian Liam Schenk,<br><br>Defendant. | Case No. 0:26-cr-00174-SRN-SGE<br><br>**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND FOR AN EVIDENTIARY HEARING** |

## INTRODUCTION

The government's case against Christian Schenk rests on two things: records from Minnesota's Statewide Voter Registration System and an electronic poll book, showing that a voter with his name was registered on September 12, 2024 and signed a roster at Eden Prairie Precinct 20 on November 5, 2024, and a recorded statement he gave to two Homeland Security Investigations agents on August 13, 2026, after he appeared at the Whipple Federal Building in response to an official letter and was taken into custody on an administrative warrant. How the government came to have the first, and the circumstances under which it obtained the second, are the subject of this motion.

The government's account of the records is two sentences: a subpoena "was issued to the state of Minnesota Secretary of State" on or about March 31, 2026, and Hennepin County "responded to a subpoena" on September 10, 2026. (CLS_00000233, 545.) It has produced neither subpoena nor either return and has not said who issued them or why. ICE's own records show that HSI St. Paul opened a "Hennepin County Voter Fraud" criminal case in which Mr. Schenk became a target, "referred 20 targets to USCIS for

administrative subpoenas of voter records," and planned administrative arrests and interviews of targets because, "[a]ccording to the local AUSA, the results of these administrative arrests and interviews will be used to support the ongoing criminal case." (Ex. B at 005, 008.) In a companion case from the same investigation, DHS has filed the "immigration subpoena" with which, its agent swears, these investigations "typically commence": a USCIS Form I-138 for "Applicants for Immigration Benefits," served with a memorandum reciting a benefits-eligibility purpose. (Ex. C at 001, 004, 005 ¶ 4.) No pending application for any immigration benefit has been identified in the production: the displayed USCIS history lists an I-90 approved and closed in February 2023, and Mr. Schenk said on August 13 that no naturalization application was underway. (CLS_00000543; CLS_00000579.) If his records were obtained by such a subpoena, and no bona fide benefits purpose existed, they were obtained on a representation that was false when made, by a civil agency acting as the "cat's paw" of a criminal investigation. *Abel v. United States*, 362 U.S. 217, 230 (1960).

What followed matched the method. Mr. Schenk was called in by an HSI special agent's DHS "Call-In Letter" whose stated reason was "Voter Registration as a Legal Permanent Resident (LPR)" (Ex. F), taken into custody on an administrative warrant issued on a charge entered the day after the letter was signed, asked whether he was a citizen before he was warned of anything, and then questioned by HSI criminal investigators about his citizenship and the alleged vote, the elements of the offenses with which he was indicted six weeks later. "The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the

courts." *Abel*, 362 U.S. at 226. Mr. Schenk asks the Court to hold an evidentiary hearing at which the government must establish how it obtained the evidence it intends to use against him, and, on that record, to suppress his statements of August 13, 2026 and, to the extent the grounds below are established, the voter records and the fruits of each.

## STATEMENT OF FACTS

The facts are drawn from the discovery produced October 13, 2026 (cited by Bates number "CLS_"), from public court records, from ICE records released under the Freedom of Information Act on October 1, 2026 (Ex. B), and from documents DHS filed in the Immigration Court on October 26, 2026 in the removal proceeding of another target of the same investigation (Ex. C, redacted).[1] Where a fact is inferred rather than established, the memorandum says so.

### A. The federal effort to obtain Minnesota's voter rolls, and Minnesota's refusal.

In June 2025 the Civil Rights Division demanded Minnesota's complete, unredacted Statewide Voter Registration List, including each voter's date of birth, partial Social Security number, and driver's license number, intending to share it with HSI "so that HSI could 'conduct appropriate investigation of potential violations of federal election law'"; the Secretary of State declined, and the Department sued. *United States v. Simon*, No. 25-cv-3761 (KMM/EMB), 2026 WL 2389778, at *1, *5–6 (D. Minn. Aug. 17, 2026); *Common Cause v. U.S. Dep't of Justice*, No. 1:26-cv-01352 (SLS), ECF No. 51, slip op. at

[1] The cited discovery pages are collected, in Bates order and with the redactions required by Fed. R. Crim. P. 49.1, as Exhibit D to the Declaration of Nico Ratkowski filed with this motion.

12 (D.D.C. Oct. 9, 2026). Minnesota never produced its list. Judge Schiltz quashed six grand jury subpoenas served in January 2026 on Minnesota state and local officials for records concerning federal immigration enforcement, finding that "the Department is not conducting a criminal investigation, but is instead using the grand-jury process for other (unlawful) purposes," in a campaign that included the Attorney General's demand for "access to Minnesota's voter rolls," *In re Grand Jury Subpoenas*, 835 F. Supp. 3d 947, 953, 961 (D. Minn. 2026); Judge Menendez dismissed the suit for the list, *Simon*, 2026 WL 2389778, at *12–13, *appeal docketed*, No. 26-2679 (8th Cir.). None of those rulings addressed Mr. Schenk's records; they describe the initiative of which his case was a part.

**B. HSI's "voter fraud" initiative, and its use of USCIS subpoenas.**

While the civil suit was pending, HSI St. Paul opened two criminal cases. MS17HR26MS0006, "Minnesota Voter Fraud," opened February 6, 2026: "The USAO is interested in prosecuting 18 U.S.C. 611. Currently reviewing GJ return data for target identification/presentation." MS17HR26MS0010, "Hennepin County Voter Fraud," opened February 17, 2026: "The USAO is interested in prosecuting 18 U.S.C. 611. Anticipated activity: issuance of GJ subpoenas for voter records, review of voter registration data, interviews of targets." (Ex. B at 005; *see id.* at 009.) HSI's "Consolidated Report" of July 23, 2026 states, of the Hennepin County case, that "HSI, FBI, DOS, and USCIS are investigating alleged voter fraud in Hennepin County" and that "HSI MSP referred 20 targets to USCIS for administrative subpoenas of voter records." (*Id.* at 006–008.) Describing administrative arrests of two other targets planned for July 28 and 29, 2026, it states: "According to the local AUSA, the results of these administrative arrests

and interviews will be used to support the ongoing criminal case." (*Id.* at 008.) None of these passages names Mr. Schenk; they describe the method of the initiative in which he was a target.

The form such a subpoena takes is in the record. In the removal proceeding of another target of case MS17HR26MS0010, DHS filed on October 26, 2026 an "immigration subpoena" for that person's voter records: a DHS Form I-138, citing 8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4, addressed to the Secretary of State, dated July 22, 2026, signed by a USCIS "Supervisory Immigration Officer," and served by Immigration Officer Brian R. Boyd. (Ex. C at 001–002.) Its "Title of Proceeding" box reads "Applicants for Immigration Benefits," and it demands the "MN Voter Registration Public Information Report to include Voting History" for the persons listed in an attached memorandum. (*Id.* at 001.) The memorandum, on USCIS letterhead and signed by Officer Boyd, lists the "Immigration applicants" and explains: "USCIS adjudicates applications for immigration benefits. These records are being requested to determine eligibility for an immigration benefit." (*Id.* at 003–004.) The person whose records it demanded had no application for any immigration benefit pending. (Ratkowski Decl. ¶ 4.) Alongside the subpoena, DHS filed a declaration under penalty of perjury by HSI Special Agent Jessica Matos: "Unlawful voter investigations in Minnesota typically commence with an immigration subpoena to the Minnesota Secretary of State." (*Id.* at 005 ¶ 4.) The companion respondent's Form I-213, like Mr. Schenk's, recites a subpoena for voter records issued "[o]n or about March 31, 2026"; the subpoena DHS filed is dated July 22, 2026, the month of HSI's referral of "20 targets to USCIS for administrative subpoenas." (Ratkowski Decl. ¶ 5; Ex. B at 008;

Ex. C at 001.)

**C. The investigation of Mr. Schenk.**

Mr. Schenk is a citizen of Canada admitted at Detroit on March 12, 2013 as a lawful permanent resident; in 2024 he lived in Eden Prairie, Minnesota, and he is married to a United States citizen. (CLS_00000233–34, 579, 583.) The USCIS benefits-history record in the production shows one application since 2013: a Form I-90 to replace his permanent resident card, filed February 13, 2023, approved that month, and listed as "Closed." (CLS_00000234; CLS_00000543.)

*The identification and the first subpoena.* An HSI report states that Mr. Schenk "was identified by the Minnesota Voter Integrity Task Force (VITF) as a suspected unlawfully registered Minnesota voter." (CLS_00000002.) The only description of how the government connected Mr. Schenk to a vote is one sentence in the Form I-213 prepared on the day of his administrative arrest: "On or about March 31, 2026, a subpoena was issued to the state of Minnesota Secretary of State requesting SCHENK's Minnesota voter registration application, copy of his voter registration card, and voting records," to which the Secretary "responded with Minnesota voter information revealing that SCHENK (Voter ID: 6509694) voted in person on November 5, 2024 at the State General Elections at Eden Prairie P-20." (CLS_00000233.) The subpoena, any cover memorandum, and the return are not in the discovery. What the production attributes to the Secretary is a Voter Registration Public Information Report showing a "Registration Date" of September 12, 2024 and a single voting-history entry for November 5, 2024 (CLS_00000586); a voting-history screen recording that entry with the source "Roster" (CLS_00000584); and a voter-

record screen on which the status, source, verification-status, registration-date, application-date, and reason fields are blacked out (CLS_00000585). No registration application, card, or oath was produced, although the subpoena asked for the application.

*The subject profile.* By May 12, 2026, Mr. Schenk had an HSI "Subject Profile" in case MS17HR26MS0010 that describes itself as "preliminary criminal analysis supporting an ongoing criminal investigation" of "aliens who have voted and/or registered to vote in federal elections contrary to federal law," and lists a TECS identifier for him. (CLS_00000546–47.)

*The call-in letter, the administrative charge, and the warrant.* On August 4, 2026, HSI Special Agent Emmanuel Herrera signed a DHS Form G-56 "Call-In Letter," addressed to Mr. Schenk at his home, directing him to "come to the office listed below," Homeland Security Investigations at the Whipple Building, at 10:00 a.m. on Thursday, August 13, 2026, "in connection with an official matter," to "Ask For: SA Emmanuel Herrera," and to bring "Valid Identification, Legal Permanent Resident Card, Passport (if one is issued)." (Ex. F.) Its "Reason for Appointment" line reads: "Voter Registration as a Legal Permanent Resident (LPR)." (*Id.*) The letter is before the Court because Mr. Schenk kept it (Ratkowski Decl. ¶ 9); the government has not produced its copy, although the recording refers to it: "That's the call in letter? Yeah. Okay." (CLS_00000580.) The next day, August 5, an administrative charge of removability under INA § 237(a)(6) was entered against him. (CLS_00000233.) A Form I-200 administrative warrant of arrest was issued before he arrived on August 13; neither it nor any supporting document has been produced. Agent Herrera, whom the letter told Mr. Schenk to ask for, prepared and signed the I-213

that day. (CLS_00000232–34.)

*The interview.* Mr. Schenk appeared as directed. The government's documents describe what followed in two ways. The I-213 states that "at approximately 0945" he "surrendered himself to the custody of Homeland Security Investigations (HSI) Special Agents"; that Special Agents Luis Cota and Luke Westrum, of ICE's criminal investigative arm, gave him the ICE rights form and he "freely and voluntarily provided a statement"; and that after the statement the agents "explained to SCHENK that he had an I-200 Administrative Warrant for his Arrest" and "escorted SCHENK to the Whipple Building interview and processing areas." (CLS_00000233.) The agents' interview report states instead that he "surrendered himself" at "approximately 0955," that "[a]t approximately 0957 hours" the agents "explained to SCHENK that he had an I-200 Administrative Warrant for his arrest" and "escorted" him to the interview area, and that "[a]t approximately 1000 hours" he was given the rights form. (CLS_00000548; CLS_00000575.) The recording begins at 9:57 a.m. and runs eight minutes and thirty-seven seconds; the rights form was completed at 10:00 and the interview ended at 10:05. (CLS_00000578, 580, 582.) The warrant explanation is not on the recording. On the I-213's account, Mr. Schenk was in custody for roughly twelve minutes before the recording began.

The transcript attributes some remarks and one question to a "Speaker 3," whom it does not identify. (CLS_00000578–82.) According to the government's transcript, which it labels "unverified," Agent Cota opened: "Mr. Shank, we have a few questions in regards to voting activity, but before I proceed, I, uh, I'm gonna ask you for your biographical

information just to confirm it's you." (CLS_00000578.) He asked, without any warning of rights, for Mr. Schenk's biographical details and then: "Are you a United States citizen?" Mr. Schenk answered: "Negative." The agent continued: "And you are a lawfully admitted permanent resident in Green [Card] . . . correct?" "Yes." He asked whether any application "to naturalize" was pending, and was told that nothing was "underway." Only then did the agent say: "And then I have to ask, how proficient are you with reading and writing English? Very. Okay, great. So the reason I ask is I'm gonna read you your rights." (CLS_00000579.)

The agent read the warnings from the ICE form. Asked "Are you bearing these rights in mind? Are you willing to answer my questions at this time?", Mr. Schenk answered: "I'm willing to start, if things get uncomfortable, I'll pro. I'll probably say something, but I mean, I'd like to, you know, g get, I don't, I wanna make sure that you." The agent's next words were: "Guys get, it's completely up to you. It's yes or." Mr. Schenk: "Yeah, I'd like to answer Yes. Okay. I'd like the answers in questions." He initialed and signed the form, marked "Rights Understood. At 10:00 AM." (CLS_00000577, 579–80.) The questioning that followed concerned voting, registration, and the identification Mr. Schenk had shown at the polling place. Mr. Schenk said he had never voted, that he "was registered to vote not by myself," and that he told the election judge "I cannot vote." (CLS_00000580–81.) The agent told him: "the reason we brought you in is because we have um, certain proof, right?" (CLS_00000581.) The agent summarized: "So have you ever voted in Minnesota? No. Okay. And you know, it's illegal to vote." Mr. Schenk: "I did. As a resident, I know it's illegal to register to vote." (CLS_00000581–82.) The

interview ended at 10:05 a.m. (CLS_00000582.) Mr. Schenk was served with a Notice to Appear and, "[b]ased on the advice of the ICE Office of Chief Counsel," released on his own recognizance. (CLS_00000234.)

*The second subpoena, the indictment, and the arrest.* A report dated September 30, 2026 states that on September 10, 2026, "Hennepin County Election Office responded to a subpoena with records showing SCHENK's Hennepin County Voter History in the November 5, 2024 State General Election," and that "[t]he United States Attorney's Office, District of Minnesota, accepted the case for federal prosecution," without saying when. (CLS_00000545.) The county subpoena, its issuer, its recited purpose, and its complete return have not been produced. The electronic poll-book certificate bearing Mr. Schenk's signature and full date of birth, a county polling-place record whose route into the production is not identified, is the only document in the production that records the act the government calls a vote and the only one containing a statement of citizenship attributable to him. (CLS_00000583.) The grand jury returned the indictment on September 24, 2026. (Dkt. 1.) Five days later, USCIS transmitted certified copies from Mr. Schenk's A-file to Officer Boyd, the officer who served the companion-case subpoena, "[i]n response to your request," a request of unstated date (CLS_00000230), and HSI agents arrested him on the criminal warrant after his counsel arranged his surrender (CLS_00000001).

**D. What the government has not produced.**

By letter dated October 23, 2026, counsel requested, among other things, both subpoenas with their authority, issuing officials, statements of purpose, and complete returns; the VITF referral, the TECS record, the HSI referral to USCIS, and any database

query that identified Mr. Schenk; the I-200 warrant and its supporting documents, the August 5 charge record, and the call-in letter; the agents' rough notes and any record of the interval before the recording began; HSI, USCIS, and United States Attorney's Office communications concerning the use of administrative subpoenas, arrests, and interviews in the investigation; the remainder of the certified DPS record; and an unredacted copy of CLS_00000585. As of this filing, the government is preparing its response and has not produced anything further. (Ratkowski Decl. ¶ 8.) Mr. Schenk's copy of the call-in letter is Exhibit F; the government's copy, and the records of who directed its issuance and why, remain outstanding.

## ARGUMENT

### I. The Court Should Hold an Evidentiary Hearing.

An evidentiary hearing is required where "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Losing*, 539 F.2d 1174, 1177–78 (8th Cir. 1976); *see* Fed. R. Crim. P. 12(d), 47(b); Dkt. 18 § IV.B. Three sets of facts are contested or unknown and material, each documented in the government's own records: the provenance of the voter records (who issued the subpoena of on or about March 31, 2026 and the subpoena Hennepin County answered on September 10, 2026, under what authority, on what representation of purpose, and what was produced); the purpose of the administrative process (whether the call-in letter of August 4, the charge entered the next day, and the I-200 warrant were "a bona fide preliminary step in a deportation proceeding" or "an instrument of criminal law

enforcement," *Abel*, 362 U.S. at 230); and the circumstances of the interview (what Mr. Schenk was told before 9:57 a.m., when he was told of the warrant, what the agents knew when they asked whether he was a citizen, and who else was present).

Mr. Schenk bears the initial burden of showing a personal expectation of privacy as to any Fourth Amendment claim concerning the records (Dkt. 18 at 6), a threshold showing of improper purpose as to any grand-jury claim, and custody and interrogation as to the claims under *Miranda v. Arizona*, 384 U.S. 436 (1966). The government must then prove waiver and voluntariness by a preponderance, *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); must prove that it did not deliberately circumvent *Miranda*, *United States v. Ollie*, 442 F.3d 1135, 1142–43 (8th Cir. 2006); and must substantiate any asserted proper grand-jury purpose in proportion to "the strength of a movant's evidence," *In re Grand Jury Subpoenas*, 835 F. Supp. 3d at 955–56. The Court should order the government to produce before the hearing the materials identified in Part D of the Statement of Facts that are discoverable under Rule 16, *Brady*, or the Court's orders (Dkts. 17, 18), to preserve all other agent notes and to produce at the hearing each witness's statements as Rules 12(h) and 26.2(a) require, subject to excision under Rule 26.2(c), and should hear testimony from Special Agents Cota and Westrum, from Special Agent Emmanuel Herrera, who signed the call-in letter and prepared the I-213, from the HSI case agent for case MS17HR26MS0010, and from the USCIS official who issued each administrative subpoena for Mr. Schenk's records. To the extent any of this material is a matter occurring before the grand jury, Mr. Schenk requests disclosure under Rule 6(e)(3)(E)(ii) or in camera review, on the showing in Part II.C.

## II. The Voter Records Were Obtained Through Process the Government Was Not Entitled to Use.

### A. Standing, and how this Part fits with the rest of the motion.

The grounds in this Part concern records obtained from third parties, and a defendant asserting Fourth Amendment rights must show a personal and reasonable expectation of privacy. (Dkt. 18 at 6 (quoting *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017)).) Mr. Schenk is aware that a defendant lacks standing to challenge a subpoena for a third party's business records, *United States v. Wilson*, 806 F.2d 171, 175 (8th Cir. 1986), *modified on reh'g*, 815 F.2d 52 (8th Cir. 1987) (per curiam); that the Eighth Circuit has applied the third-party doctrine to subscriber information, *United States v. Wheelock*, 772 F.3d 825, 828–29 (8th Cir. 2014); and that the Supreme Court has refused to suppress evidence obtained by the government's deliberate wrong against a third party where no right of the defendant was violated, *United States v. Payner*, 447 U.S. 727, 731–37 (1980). He therefore presents the administrative-subpoena argument (Part II.B) principally as proof of the purpose for which the government proceeded against him administratively, which *Abel* makes dispositive of the statements (Part III); the grand-jury argument (Part II.C) as one that does not depend on a privacy interest, because the rule against an improper dominant purpose and Rule 6(e) protect the person against whom the process is used, *United States v. Wadlington*, 233 F.3d 1067, 1073–74 (8th Cir. 2000); and the Fourth Amendment argument (Part II.D) in the alternative, under *Carpenter v. United States*, 585 U.S. 296 (2018).

### B. If the administrative subpoenas recited a benefits purpose that did not exist, the recital is evidence of purpose.

An immigration officer may "require by subpoena . . . the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service." 8 U.S.C. § 1225(d)(4)(A). The regulation authorizes specified officers, and others "expressly delegated such authority," to issue subpoenas "for use in criminal or civil investigations," on Form I-138. 8 C.F.R. § 287.4(a)(1), (b). Mr. Schenk acknowledges that unlawful voting is a ground of removability, 8 U.S.C. § 1227(a)(6), so that a subpoena for voting records can in principle serve a genuine immigration purpose, and that administrative process may be used where civil and criminal purposes coexist, so long as the agency acts in good faith within its own authority. *United States v. Kordel*, 397 U.S. 1, 11–12 (1970) (reserving cases in which the government "has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution").

The question here is narrower: whether a USCIS officer may demand a state election official's records on the representation that they are needed "to determine eligibility for an immigration benefit" for an "[a]pplicant[] for Immigration Benefits," when no pending benefits adjudication has been identified for the person named. The government's own filings establish the pattern: its agent has sworn that these investigations "typically commence with an immigration subpoena to the Minnesota Secretary of State"; the

subpoena it produced in the companion case recites an "Applicants for Immigration Benefits" proceeding and a benefits-eligibility purpose for a person who had no application pending; HSI describes the subpoenas as its criminal referrals "to USCIS for administrative subpoenas of voter records," in a case opened because "[t]he USAO is interested in prosecuting 18 U.S.C. 611"; and Mr. Schenk's I-213 describes the March 31 subpoena in the same words as that companion-case target's I-213. (Ex. C at 001, 004, 005 ¶ 4; Ex. B at 005, 008; CLS_00000233; Ratkowski Decl. ¶¶ 4–5.) No pending benefits application has been identified in the production for Mr. Schenk. (CLS_00000543; CLS_00000579.) If his subpoenas carried the recital that the companion-case subpoena carried, and no bona fide benefits purpose existed, they were issued on a representation that was false when made; whether the recipient relied on it is a question for the hearing.

The falsity matters for three reasons. First, Minnesota law conditions the Secretary's disclosure on the purpose of the request: data may be furnished to a public official for "a law enforcement inquiry concerning a violation of or failure to comply with any criminal statute," Minn. Stat. § 201.091, subds. 1, 4(b), or to a registered Minnesota voter on a written undertaking, *id.* subd. 5. An inquiry into "eligibility for an immigration benefit" is neither, and a request that disclosed its actual purpose, a criminal investigation of the named individual, would have been a "law enforcement inquiry" the Secretary could evaluate as such and that could not include the voter's date of birth, *id.* subd. 9. If the Secretary acted on the recital, it was the key that fit the lock. Second, the regulation requires a subpoena to "state the title of the proceeding," 8 C.F.R. § 287.4(b)(2), and the statute confines the authority to matters "material and relevant to the enforcement of this chapter,"

8 U.S.C. § 1225(d)(4)(A); a subpoena issued by a benefits adjudicator reciting a benefits proceeding that did not exist, at the request of criminal investigators pursuing a Title 18 prosecution, is not within that authority on its face, and it is for the government to identify the immigration proceeding, if any, that it served. Third, and most important, the recital is direct evidence of purpose. An agency that obtains records for a criminal investigation by describing them as records for a benefits adjudication is not exercising its civil authority in good faith; it is lending that authority to the criminal investigators who asked for it. That is the question *Abel* makes dispositive. 362 U.S. at 230.

**C. If any of the process was grand jury process, the grand jury may have been used for a purpose the law forbids.**

HSI's records anticipated "issuance of GJ subpoenas for voter records" and described "reviewing GJ return data for target identification." (Ex. B at 005.) Press reports, cited as such, state that by late March 2026 the Secretary of State's office had received a federal grand jury subpoena for the records of more than 125 individual voters. Sarah N. Lynch & Camilo Montoya-Galvez, *Minnesota Elections Office Subpoenaed in Federal Criminal Probe over Whether Non-Citizens Are on State Voter Rolls, Sources Say*, CBS News (Mar. 26, 2026). Whether the subpoena described as issued on or about March 31, 2026, or the one the county answered in September, was a grand jury subpoena is a fact the government has not disclosed. The companion-case chronology suggests it may have been: there, as here, the I-213 recites a subpoena issued "on or about March 31, 2026," and the USCIS subpoena DHS produced is dated July 22, 2026, the month HSI reported referring twenty targets to USCIS for administrative subpoenas. (Ratkowski Decl. ¶ 5; Ex.

C at 001; Ex. B at 008.) If the March subpoenas were grand jury subpoenas, the July administrative subpoenas re-acquired, through civil process, records the government already held, so that they could be used in removal proceedings without an order under Rule 6(e); grand jury returns would have been used to select targets for civil enforcement, a use that *United States v. Sells Eng'g, Inc.*, 463 U.S. 418 (1983), and *United States v. Baggot*, 463 U.S. 476 (1983), forbid, and a later civil acquisition of the same records would not undo it. That is an inference, presented as one; whether those returns were received, what protected matter was used or disclosed, and whether the later records were obtained independently are questions the requested disclosure would answer. Mr. Schenk's separate Motion for Disclosure of Grand Jury Materials, submitted with this motion, seeks the subpoenas, the returns, the Rule 6(e)(3)(B) notices, and the related testimony under Rule 6(e)(3)(E); the government has advised that it intends to produce them.

"[A] subpoena may be quashed if its 'dominant' purpose is improper, even if it was issued partly for valid reasons," *In re Grand Jury Subpoenas*, 835 F. Supp. 3d at 954 (citing *Wadlington*, 233 F.3d at 1074). Grand jury returns may be disclosed to government personnel only as "an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law," Fed. R. Crim. P. 6(e)(3)(A)(ii), (B), and "[a]ny such use of grand jury proceedings to elicit evidence for use in a civil case is improper per se," *Sells*, 463 U.S. at 432–33; *see Baggot*, 463 U.S. at 480. If grand jury returns were used to identify Mr. Schenk for civil referral, subpoena, and arrest, the grand jury obtained the voter data Minnesota had lawfully refused to give the Department, and its returns served civil immigration enforcement rather than the

enforcement of federal criminal law. Dismissal on that ground would require a showing of prejudice, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254–56 (1988); *Wadlington*, 233 F.3d at 1073–74, and Mr. Schenk does not ask the Court to decide that now. He asks for the disclosure that would permit it to be decided, under Rule 6(e)(3)(E)(ii) or in camera, and that the use made of any returns be considered in determining the purpose of the administrative process that followed. The subpoenas are not secret from their recipients, Fed. R. Crim. P. 6(e)(2)(A)–(B), and the government has disclosed the existence of both. (CLS_00000233, 545.)

### D. In the alternative, Minnesota law and the Privacy Act give Mr. Schenk a cognizable interest in the records, and the Fourth Amendment reaches their acquisition.

Existing precedent is least favorable to Mr. Schenk on this ground. But Minnesota has classified the data and restricted its use: no list furnished to the public or to law enforcement may include "a voter's date of birth or any part of a voter's Social Security number, driver's license number, identification card number, military identification card number, or passport number." Minn. Stat. § 201.091, subd. 9. The poll-book certificate the government obtained from Hennepin County, an individual record whose route into the production is not identified, displays Mr. Schenk's full date of birth, information no list furnished under the statute may carry. (CLS_00000583.) The Privacy Act's law-enforcement exception, in turn, requires a written request from the head of the receiving agency "specifying the particular portion desired and the law enforcement activity for which the record is sought," 5 U.S.C. § 552a(a)(2), (b)(7); the District of Columbia court held this month that the Department's wholesale transfer of voter rolls to HSI did not fit

that exception. *Common Cause*, slip op. at 66–68. The government has appealed, *id.*, ECF No. 55 (Oct. 16, 2026), and relies on the Supreme Court's order staying a judgment against DHS's changes to the SAVE system because 8 U.S.C. § 1373 "likely supersedes restrictions on disclosure elsewhere in the Code" as to citizenship-status information, *Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308, slip op. at 5 (U.S. Sept. 25, 2026) (per curiam); *see Common Cause*, ECF No. 60, at 7–9 (Oct. 26, 2026). Neither ruling concerns the acquisition of one person's state voter records by a subpoena reciting a benefits purpose. If the government relies on § 1373, a published routine use, 5 U.S.C. § 552a(b)(3), or other authority for any interagency disclosure of a record about Mr. Schenk, it must identify the record, the disclosure, and the authority at the hearing.

A violation of state law or a federal statute does not by itself require suppression in a federal prosecution. *Wheelock*, 772 F.3d at 830. But *Wheelock* rested on the fact that the Minnesota statute there at issue itself authorized disclosure to law enforcement on administrative subpoena, so that the defendant "could not have reasonably expected" the statute to protect him, and it recognized that state statutes may inform the reasonable-expectation inquiry. *Id.* at 829. Minnesota's voter-data statute does the opposite: it limits disclosure by purpose and recipient and excludes dates of birth from any list furnished to the public or to law enforcement, and nothing in the government's documents identifies a route under it for the disclosures they describe. And the third-party doctrine does not mechanically extend to comprehensive records compiled about a person by an entity to which he had no practical choice but to give his information, *Carpenter*, 585 U.S. at 309–16; last Term the Court held that a cell-phone user retained a reasonable expectation of

privacy in location history Google had collected, which is not shared with the world "just by doing the ordinary things cell-phone users do," *Chatrie v. United States*, 609 U.S. 605, 632–37 (2026) (reasonableness of the search left for remand, *id.* at 638–41). Mr. Schenk presents the extension as an argument, not a holding; *Carpenter* left the traditional third-party cases in place, 585 U.S. at 316. A lawful resident who gives the State his date of birth, Social Security number, and license number to obtain a driver's license, as Minnesota law requires, does not thereby expose that information to any federal agency that cares to ask.

**E. The statements are fruits.**

The fruits analysis runs separately from each wrong. If the administrative arrest was an instrument of criminal law enforcement rather than a bona fide step toward removal (Part III), the statements made in the custody it produced are its fruit, *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); the proximity was minutes, there was no intervening circumstance, and the purpose was the point, *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *Utah v. Strieff*, 579 U.S. 232, 239 (2016). If grand jury process was misused (Part II.C), the remedy awaits disclosure, and Mr. Schenk preserves his request that the fruits be excluded. If the acquisition of the records violated his own Fourth Amendment rights (Part II.D), the records and derivative evidence are fruits, subject to the government's showing of attenuation, independent source, or inevitable discovery, on which it bears the burden. *Nix v. Williams*, 467 U.S. 431, 444 (1984); *Murray v. United States*, 487 U.S. 533, 542 (1988). The government's documents describe a single planned operation from the March subpoena to the September county return; Mr. Schenk does not contend that the

government could never have identified him lawfully, only that it has not identified any such route and must. A *Miranda* violation alone does not require suppression of physical evidence derived from a voluntary unwarned statement, *United States v. Patane*, 542 U.S. 630, 634 (2004) (plurality opinion), or bar impeachment use, *Harris v. New York*, 401 U.S. 222, 224–26 (1971), so the relief sought as to the records rests on Parts II and III.

### III. The Administrative Arrest and Interview Were an Instrument of Criminal Law Enforcement, and the Statements Must Be Suppressed Under *Abel.*

In *Abel*, the Court upheld the use of evidence seized incident to an administrative immigration arrest, but only after satisfying itself that the arrest was "a bona fide preliminary step in a deportation proceeding" and not "an instrument of criminal law enforcement to circumvent the latter's legal restrictions." 362 U.S. at 230. The test is "whether the decision to proceed administratively toward deportation was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime." *Id.* The line between "proper cooperation" and the "improper use of immigration authorities," *id.* at 229–30, is a question of fact about purpose.

The government will point out that removal proceedings are pending. But *Abel*'s question concerns "the decision to proceed administratively" and the purpose for which it "was carried out," 362 U.S. at 230, not whether a removal proceeding was eventually commenced; the deportation proceeding in *Abel* was also genuine. Here the government's own documents raise the inference. HSI's report explains that administrative arrests and interviews of "targets" in this initiative were planned because, according to the local AUSA, their results "will be used to support the ongoing criminal case." (Ex. B at 008.)

That passage concerns two other targets; Mr. Schenk's case matches the method at every step. He was the subject of "preliminary criminal analysis supporting an ongoing criminal investigation" by May 12, 2026, three months before any administrative charge was lodged. (CLS_00000546–47.) The letter came first. On August 4, an HSI special agent signed a Form G-56 directing Mr. Schenk to appear before HSI nine days later, naming as the "Reason for Appointment" the subject of the criminal investigation, "Voter Registration as a Legal Permanent Resident (LPR)," and telling him to bring "Valid Identification" and his "Legal Permanent Resident Card," the documents that establish his identity and his noncitizenship, the fact on which both charged offenses turn. (Ex. F.) The administrative charge was entered the next day (CLS_00000233); the sequence and the planning documents support the inference that it was entered so that a warrant would be available when he arrived. The letter disclosed the subject, not the purpose: it describes the appointment as "an official matter" and says nothing of a criminal investigation or a contemplated prosecution; used, as it was, as the first step of an administrative arrest, that is the circumstance *Kordel* reserved. 397 U.S. at 11–12. The agent who signed the letter prepared the I-213 that recorded the arrest. (CLS_00000232–34.) The agents who took him into custody were HSI criminal investigators, who opened by announcing "questions in regards to voting activity," asked nothing about his admission, residence, or eligibility for relief that a removal proceeding would require, devoted the interview, beyond identifying information, to his citizenship and the alleged vote, the elements of §§ 611 and 1015(f), and told him why he was there: "the reason we brought you in is because we have um,

certain proof." (CLS_00000578–82.) Six weeks after the interview he was indicted and arrested by the same agency on a criminal warrant. (Dkt. 1; CLS_00000001.)

An administrative warrant was used to take a target of a criminal investigation into custody, in a setting designed to produce a statement, so that the statement could be used in the criminal case. If the government had, by August 2026, evidence that Mr. Schenk had committed a felony under § 1015(f), HSI agents could have sought a complaint and arrest warrant from a judicial officer, Fed. R. Crim. P. 3, 4, or, if the statutory conditions were met, arrested him without one, 8 U.S.C. § 1357(a)(5)(B); 19 U.S.C. § 1589a(3), in which event he would have been brought "without unnecessary delay" before a magistrate judge, who would have advised him of his rights and appointed counsel, Fed. R. Crim. P. 5(a), (d), 44(a). By proceeding instead under an administrative warrant, obtained without judicial involvement on a charge that, on the inference above, was entered for the purpose, the government placed him in custody, questioned him in a proceeding it had labeled civil, and then released him "on the advice of" its own lawyers with a Notice to Appear. (CLS_00000234.) That is the "deliberate use . . . of an administrative warrant for the purpose of gathering evidence in a criminal case" that *Abel* condemns, 362 U.S. at 226. The government cannot choose a civil label to lower the protections that attend a criminal interrogation. *Mathis v. United States*, 391 U.S. 1, 4–5 (1968); *United States v. Mellado-Evanguelista*, No. 08-307(1) (RHK/JJK), 2009 WL 161240, at *4 (D. Minn. Jan. 22, 2009); *United States v. Mata-Abundiz*, 717 F.2d 1277, 1279–80 (9th Cir. 1983).

Mr. Schenk acknowledges the Eighth Circuit's treatment of *Abel* in *United States v. Clarke*, 110 F.3d 612 (8th Cir. 1997), which reversed the suppression of a confession that

followed a state-law arrest of a federal target, applying *Whren*'s rule that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" to "all police activities for which probable cause is required." *Id.* at 613–14 (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). Turning to *Abel*, the court said: "We wonder, in the first place, about the continued validity of *Abel* in light of *Whren*. But we believe, in any event, that the present case is distinguishable, because the gravamen of the defendant's complaint in *Abel* was that the FBI did not have probable cause to arrest him for espionage. Here it is admitted that there was ample cause to arrest Ms. Clarke for the very offense with which she was eventually charged." *Id.* at 614. Mr. Schenk is not aware of an Eighth Circuit decision that has suppressed evidence under *Abel*, and he does not present *Abel* as a rule that subjective motive invalidates an arrest supported by probable cause.

*Clarke* does not foreclose this ground, for three reasons. First, *Clarke* distinguished *Abel* on a ground absent here: the arrest in *Clarke* was a criminal arrest on conceded probable cause for the very offense charged. The warrant here was a Form I-200, issued by an immigration officer on an administrative finding of removability, not by a judicial officer on probable cause of a crime, and whether the facts known to the agents on August 13, 2026 objectively established criminal probable cause is a question of fact the later indictment does not answer, while what the agents believed and intended bears on the purpose inquiry; the government's records first describe the case as "accepted" for prosecution in a report dated September 30, after the county's September 10 return. (CLS_00000545.) If the government lacked criminal probable cause, the "gravamen" of *Abel* is present. Mr. Schenk acknowledges that if criminal probable cause existed on

August 13, *Clarke*'s holding that an officer's choice among available arrest authorities is not reviewed for motive substantially strengthens the government's position on the arrest; he preserves the argument that, notwithstanding that reasoning, the route the government chose dispensed with a judicial determination of probable cause, presentment, and the advice of rights and appointment of counsel that attend an initial appearance, which is the "circumvent[ion of] the latter's legal restrictions" that *Abel* described. 362 U.S. at 230. Second, *Whren* itself preserved the purpose inquiry for intrusions justified by an administrative scheme rather than individualized probable cause: the exemption from probable cause "accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are not made for those purposes," 517 U.S. at 811–12, and an administrative immigration arrest is justified, if at all, by the removal process it serves. Third, the purpose of the encounter bears on the Fifth Amendment grounds in Part IV in their own right: on whether the agents "should know" that their questions were "reasonably likely to elicit an incriminating response," *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), on the deliberateness of the two-step, and on the voluntariness of the waiver.

## IV. The Statements Were Obtained in Violation of *Miranda*.

Even if the voter records were lawfully obtained and the administrative process bona fide, the statements must be suppressed because they were the product of custodial interrogation that did not comply with *Miranda*. *Miranda* applies to custodial questioning by immigration officers when the answers may be used in a criminal prosecution, whatever

label the agency attaches. *Mathis*, 391 U.S. at 4–5. Each ground in this Part stands on its own, and the ground in Part IV.B is independent of every other ground in this motion.

**A. Mr. Schenk was in custody.**

The custody inquiry asks whether, in light of the objective circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave," and whether "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (cleaned up); *see United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Both are satisfied. The government's own records state that he "surrendered himself to the custody of" HSI, that two agents "explained to SCHENK that he had an I-200 Administrative Warrant for his Arrest," and that they "escorted" him to the "interview and processing areas." (CLS_00000233; CLS_00000548.) A person told by federal agents that there is a warrant for his arrest, and escorted by them into an interview room in a secure federal building, is not free to leave, and questioning there by two agents is the station-house setting *Miranda* addressed. Mr. Schenk had been directed there in writing by the agency, for a 10:00 a.m. appointment, and instructed to bring his identity documents, and on the I-213's account he was in HSI's custody fifteen minutes before the appointed hour. (Ex. F; CLS_00000233.) That he was not handcuffed does not change the character of an arrest, and on either of the government's accounts of when he was told of the warrant he was, by its own description, in its "custody" from the moment he arrived. *See Ollie*, 442 F.3d at 1138–40 (suspect who came to the police station at his parole officer's direction and was questioned there was in custody);

Mr. Schenk, told in writing to come and then told of a warrant for his arrest, has the stronger claim.

### B. The agents interrogated Mr. Schenk before warning him, and the pre-warning citizenship exchange must be suppressed on this ground alone.

Interrogation includes "express questioning" and any "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301; *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004). Routine booking questions are excepted, but not questions "designed to elicit incriminatory admissions." *Pennsylvania v. Muniz*, 496 U.S. 582, 602 n.14 (1990) (plurality opinion). Noncitizenship is the fact on which both charged offenses turn: § 611 applies only to "any alien," and a claim of citizenship is false under § 1015(f) only if the speaker is not a citizen. A question to the target of a §§ 611 and 1015(f) investigation about whether he is a United States citizen is a question about that fact, and an HSI agent who has just announced that his questions concern "voting activity" knows it. The agency already knew the answer: the call-in letter it sent nine days earlier gave as its reason "Voter Registration as a Legal Permanent Resident (LPR)." (Ex. F.) The question was asked to obtain the admission, not the information. The agent asked the question, confirmed the answer ("lawfully admitted permanent resident . . . correct?"), asked whether any naturalization application was pending, asked about Mr. Schenk's English, and only then read the warnings. (CLS_00000579.) The sequence placed the one question that answers the status element of both offenses on the unwarned side of the line.

This District has held that such questions, by immigration agents who know the

answer will bear on a criminal charge, are interrogation. In *Mellado-Evanguelista*, an ICE agent interviewed a state detainee about his citizenship and immigration history before giving warnings and testified that his inquiry was "purely administrative in nature." The court held that the questions were interrogation because the agent "knew or reasonably should [have] know[n]" they were likely to elicit incriminating responses, and that "the Government cannot avoid the requirements of *Miranda* simply by labeling immigration investigations 'civil' or 'administrative.'" 2009 WL 161240, at *4; *see* Report & Recommendation at 16, *Mellado-Evanguelista*, No. 08-307(1) (RHK/JJK), Dkt. 31 (D. Minn. Jan. 6, 2009), *adopted*, Dkt. 32 (Jan. 22, 2009) (quoting *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993)). The decisions applying the booking exception to citizenship questions involve officers who had no reason to know the answer would be used in a criminal case, and they say so: *United States v. Salgado*, 292 F.3d 1169, 1172–74 (9th Cir. 2002), held that a civil immigration officer's jailhouse questions were not interrogation because she "could not reasonably anticipate the future incriminating quality of the statements that she elicited," while recognizing that questions about citizenship put to a person interviewed "in connection with a 'prosecution for violating the immigration laws'" "might have been reasonably likely to elicit an incriminating response." *Id.* at 1172–73. *Salgado* and the earlier case it followed differed from *Mata-Abundiz*, the court explained, because in those cases the questioner "did not know from pending state charges that a federal criminal prosecution relevant to nationality could result," did not "refer the alien for criminal investigation or initiate one themselves," and the defendants were not "prosecuted forthwith on federal immigration charges." *Id.* at 1174. This case sits with

*Mata-Abundiz*: the questioner knew from his own agency's investigation that a federal prosecution turning on nationality could result, and HSI had initiated that investigation itself; the indictment six weeks later corroborates what the agents knew. The pre-warning citizenship exchange must be suppressed; the question is not whether the government can otherwise prove Mr. Schenk's status but whether this statement, and the statements built on it, may be used.

**C. The post-warning statements are tainted by the deliberate two-step.**

The warned statements concerning Mr. Schenk's citizenship, his knowledge that he could not register or vote, and his conduct at the polling place must be suppressed under *Missouri v. Seibert*, 542 U.S. 600 (2004). The Eighth Circuit applies Justice Kennedy's controlling concurrence: "[i]f the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* at 622 (Kennedy, J., concurring in the judgment); *Briones*, 390 F.3d at 613–14; *Ollie*, 442 F.3d at 1142–43 (government bears the burden of proving that it did not deliberately circumvent *Miranda*). Absent a deliberate strategy, *Oregon v. Elstad*, 470 U.S. 298, 309, 314 (1985), governs. The threshold question is deliberateness, a question of fact about the agents' design, on which the plurality's factors, *Seibert*, 542 U.S. at 615 (plurality opinion); *Briones*, 390 F.3d at 613, are circumstantial evidence.

The structure of the interview is itself evidence of design. The agent announced it before he began: there would be "questions in regards to voting activity," but "before I proceed" he would take "biographical information." (CLS_00000578.) The "biographical

information" included the citizenship question, the permanent-resident confirmation, and the naturalization question; the warnings came only after those answers were in hand. (CLS_00000579.) That division obtained Mr. Schenk's admission of noncitizenship before any warning and treated the warning as the gateway to the second round. The second round built on the first: the voting questions proceeded from the premise, established unwarned, that Mr. Schenk was "a resident" and not a citizen, and the agent's closing summary ("you know, it's illegal to vote. . . . As a resident") drew the knowledge admission out of that premise. (CLS_00000581–82.) The same agents conducted both rounds in the same room within three minutes, and no curative measure was taken. Mr. Schenk recognizes that *Briones* affirmed admission where deliberateness was not shown, 390 F.3d at 613–14, that the pre-warning exchange was brief, and that the government will call the citizenship question routine. The agent's announcement of the sequence, and the fact that the question he chose to ask before the warnings was the one that answers an element of both charges, are evidence that it was not.

**D. The government cannot show a valid waiver or a voluntary statement in the totality of the circumstances.**

A waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," *Moran v. Burbine*, 475 U.S. 412, 421 (1986), and the government must prove it by a preponderance, *Connelly*, 479 U.S. at 168. Voluntariness turns on "whether the defendant's will was overborne," judged by "the totality of the circumstances." *Dickerson v. United States*, 530 U.S. 428, 434 (2000); 18 U.S.C. § 3501(b). Involuntariness requires coercive government conduct,

*Connelly*, 479 U.S. at 167; Mr. Schenk acknowledges that he initialed and signed the form and that custody alone does not establish coercion. First, Mr. Schenk's answer to the waiver question was not "yes"; it was a conditional, hesitant statement ("I'm willing to start, if things get uncomfortable . . . I wanna make sure that you") to which, on the transcript, the agent responded before it was finished ("it's completely up to you. It's yes or"), after which Mr. Schenk said "Yeah, I'd like to answer." (CLS_00000579.) A conditional answer that the agent converted into a "yes" is evidence of what Mr. Schenk understood himself to be agreeing to. Second, the coercive conduct is the design of the encounter described in Part III: summoned by an HSI agent's letter to a federal law enforcement building, told to bring the document that proves his status, taken into custody on an administrative warrant, asked the citizenship question before any warning, and then asked to waive rights in a proceeding labeled civil and designed to produce evidence for a criminal case. A person in that position reasonably understands that his liberty, and his status in this country, depend on cooperation. If the Court finds that the government's conduct overbore his will, the statements are inadmissible for any purpose. *Mincey v. Arizona*, 437 U.S. 385, 398 (1978).

**V. Scope of Relief.**

Mr. Schenk asks the Court to suppress, on the grounds and to the extent indicated: (1) on the grounds in Parts II.C and II.D, the records obtained from the Secretary of State and the Hennepin County Election Office in response to the subpoenas of March and September 2026, including CLS_00000583 through CLS_00000586, and any record derived from either; (2) on the grounds in Parts III and IV and, to the extent causation and a personal-right or remedial basis are established, Part II, all statements made by Mr.

Schenk on August 13, 2026, including those reflected in CLS_00000232–234, CLS_00000548–549, and CLS_00000575–582, and the recording "Schenk Interview.m4a," with the pre-warning citizenship exchange suppressed on the independent ground in Part IV.B whatever the Court concludes about the remainder; (3) on the grounds in Parts II and III, any document, identification, or physical item obtained from him that day; and (4) any testimony describing the foregoing. Mr. Schenk further asks that the government be ordered to produce, before the hearing, the materials identified in Part D of the Statement of Facts, that the Court hear the testimony identified in Part I, and that he be granted leave under Rule 12(c)(3) to supplement this motion within fourteen days after the subpoenas, their returns, and the I-200 warrant and its supporting documents are produced or, if they are produced by November 13, 2026 under the proposed pre-hearing order, within seven days, so that any supplement precedes the hearing.

## CONCLUSION

The government obtained the records in this case by a route it has not disclosed, in an initiative whose design its own documents describe; it took Mr. Schenk into custody on an administrative warrant obtained for the purpose; and it structured the interview so that the question answering an element of both charged offenses was asked before any warning. The Court should hold an evidentiary hearing, require the government to account for how it obtained the voter records and why it proceeded as it did, and suppress the statements of August 13, 2026 and, on the showing made at the hearing, the voter records and the fruits of each.

Dated: October 30, 2026

Respectfully submitted,

RATKOWSKI LAW PLLC

/s/ Nico Ratkowski
Nico Ratkowski (Atty. No. 0400413)
332 Minnesota Street, Suite W1610
Saint Paul, MN 55101
P: (651) 755-5150
E: nico@ratkowskilaw.com

Attorney for Defendant

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this memorandum complies with the word limit of LR 7.1(f)(1)(A) and the type-size limit of LR 7.1(h); that it was prepared using Microsoft Word for Microsoft 365, whose word-count function was applied specifically to include all text, including headings, footnotes, and quotations, in the count below; and that the memorandum contains 9,360 words.

Dated: October 30, 2026

/s/ Nico Ratkowski
Nico Ratkowski (Atty. No. 0400413)